### Osro Shirk, Appellee, v. Chicago & Eastern Illinois Railroad Company, Appellant.

1. MASTER AND SERVANT—*when doctrine of assumed risk does not apply.* A servant injured while performing work under the specific orders of his master is not subject to the doctrine of assumed risk.

Action in case for personal injuries. Appeal from the Circuit Court of Massac county; the Hon. W. W. DUNCAN, Judge, presiding. Heard in this court at the August term, 1907. Affirmed. Opinion filed March 18, 1908.

C. L. V. MULKEY, for appellant; HOMER T. DICK, of counsel.

COURTNEY & HELM, for appellee.

MR. PRESIDING JUSTICE HIGBEE delivered the opinion of the court.

Appellee was injured while in the employ of appellant as a member of a bridge crew, loading piling on a flat car on appellant's tracks, just south of St. Elmo, in Fayette county. The piling to be loaded consisted of some twelve or more poles which were lying beside the track parallel with the flat car and were elevated over skids extended from the deck of the car to the edge of the embankment, which was about eighteen feet high. In raising the piling to the car an inch manilla rope, about 140 feet long, called the main line, was used. One end of the line was tied to a stake located on the east side of and about half way between the ends of the car. The other end of the line was then passed around the pole about to be raised and brought back to and passed over the wheel of a snatch block, fastened to the stake and then carried to a locomotive south of but not coupled to the car. At a signal given by the conductor, the locomotive would be moved forward by the engineer, the pole drawn up the dump and over the skids onto the car, where it

would be received and placed in proper position by members of the crew, stationed at each end of the car for that purpose. In raising a pole the main line was as near to the point of balance as possible, but as one end of the pole was larger than the other, a smaller rope, known as the tag line, was passed around the larger end of the pole to assist in keeping it straight. As the pole approached the car, the loose end of the tag, passing through the hands of the men handling it, was permitted to fall in a coil upon the deck of the car. There was no great strain upon the tag line as it was used more by way of precaution than as an assistance in drawing up the pole. Appellee and another employe named Henderson, were directed to take charge of the tag line. As the last pole was being loaded and had nearly reached the car, the main line broke, throwing the weight on the tag line, the loose end of which was coiled almost between and slightly to the rear of the two men handling it. As the pole slipped back the tag line ran out and while it was so doing, appellee's left foot and leg became entangled in the line and he was pulled off the car, carried down the dump in front of him and received injuries for which he brought this suit and recovered judgment.

There were three counts to the declaration. The first two were based upon the theory that appellee was inexperienced and was injured in consequence of and while obeying the negligent orders of appellant's foreman; and the third upon the theory that the injury resulted from negligence on the part of the company in knowingly furnishing unsafe and defective appliances for the work required to be done.

The evidence showed that the main line was worn and defective and had broken before that morning but did not hurt any one; that it broke close to the engine, and as there was enough to answer the purpose for which it was being used without the broken part, the short end was discarded and the remaining portion used to carry on the work. The work was pro-

ceeding rapidly as it was necessary for the working party to get out of the way of a passenger train then nearly due. There was evidence that the main rope was too small to stand the strain put upon it when the engine moved rapidly.

The principal contention developed by the briefs of the respective parties, is whether the bridge crew was working under the direction of W. P. Lyansapp, a bridge inspector of the company, or F. M. Scurlock, the foreman of the crew. When the rope broke in the morning one of the crew, Sam Vick, said to Mr. Lyansapp, "You had better take that old line off and throw it in the ditch and use the new line. That will break some man's neck if you don't be careful." To which Lyansapp replied, "I guess that line is strong enough, we haven't got time to take it off. If you fool around very long, we will have to go back to St. Elmo to let the passenger train by." Vick also testified, "Lyansapp said if they would handle the engine easily it would hold all right, not jerk the engine any." Scurlock testified he was a stranger on the road and Lyansapp had gone along with him to locate the bridges for him to help him get straightened out on the work; that he went right along after the accident; that he was on the work train the next day unloading piling, etc.; that he was with the crew part of the time and part of the time he was not. While the piling was being loaded, Lyansapp was sitting or standing on a box car next to the flat car and the foreman was on the ground helping at the work. Appellee testified that Lyansapp told him to take hold of the line and also to keep his feet off the line; that he said, "come ahead, get busy;" that he was hurrying the crew all the time; that "he was keeping us right to that line, both of us, saying, stay with her boys, hold her," and the witness Vick testified that Lyansapp said to appellee, "You fellows get hold of that line and help the boys keep that piling straight on the skids"; that Mr. Lyansapp was hurrying the boys to

get the piling on there. Witness Groves testified that Lyansapp was the boss to the best of his knowledge; that they were being hurried because it was about train time and Mr. Lyansapp wanted to get out of the way of the passenger; that Mr. Lyansapp said "hurry up, boys, it is pretty near train time. We want to get done or we have to go back to St. Elmo."

Appellee introduced evidence to the effect that Scurlock had been appointed boss of the crew. Scurlock testified not only that Lyansapp went with him to locate the bridges, but also that he had a list of bridges and a list of material to make repairs and assisted in loading and unloading to the best advantage. The real facts as they appear to us from the testimony of all of the witnesses taken together, are that Scurlock was the nominal boss of the crew, but that he was a new man; that Lyansapp had gone out with him to show him where work was needed or for some other purpose and took charge of the work, giving orders both to Scurlock and the crew; that all the directions concerning the loading of the piling and the hurrying of the work were given by Lyansapp and obeyed without question by all engaged in the work. He appears to have actually represented appellant in directing the work in question, and for his actions and directions appellant must be held responsible. Notwithstanding the fact that Lyansapp knew of the defective and insecure condition of the main line, he continued to use it even after he was warned of the danger of so doing. It is insisted by appellant that appellee knew of the danger of using the rope and that he assumed the risk of continuing at work while that rope was being used. It was however shown that appellee was inexperienced in the kind of work in which he was engaged at the time of the injury, and that Lyansapp, when told of the danger of using it, and warned that some one might be injured by it replied, "I guess that line is strong enough, we have not got time to take it off hardly." It also appeared

that Lyansapp ordered appellee to do the work in which he was engaged at the time he was injured and that his companions were told by Lyansapp to "hold it and stay with it boys;" also, "Go ahead, go it, be quick, get busy here, be quick about it."

Appellee, at the time he was injured, appears to have been acting under the direction of Lyansapp, who represented appellant as vice principal or agent in charge of the work being done, and that portion of the evidence concerning which there is no controversy shows a condition of affairs under which the doctrine of assumed risk on the part of appellee, has no application.  C., R. I. & P. R. R. Co. v. Rathneau, 225 Ill. 278; Springfield Boiler & Mfg. Co. v. Parks, 222 Ill. 355; North Chicago St. R. R. Co. v. Aufmann, 221 id. 614; Hansell-Elcock Foundry Co. v. Clark, 214 id. 399; City of La Salle v. Kostka, 190 id. 130.

As to the question of ordinary care on the part of appellee there was evidence to warrant the jury in finding in his favor.

The only reason urged by appellant for reversing the judgment besides those which are based entirely upon the facts, is that the court erred in the matter of instructions, and the principal objection to them is that the court refused certain instructions and modified others offered by appellant in support of its theory of assumed risk.  Entertaining the views of the law as applied to this case which we have above expressed, we are of opinion the court committed no error in this regard, and that the instructions as a whole presented the law of the case fairly to the jury.

The judgment of the court below will be affirmed.

*Affirmed.*